Don Springmeyer, Esq. (NBN 1021)
KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
Tel: (702) 385-6000
Email: d.springmeyer@kempjones.com

*Counsel for Plaintiff*

*(Additional Counsel Listed on Signature Page)*

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| **DAVID LACKEY**, *individually and on behalf of all other similarly situated,* | Case No.: |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| **MGM RESORTS INTERNATIONAL** | |
| Defendant. | |

Plaintiff David Lackey ("Plaintiff") brings this Class Action Complaint, individually and on behalf of all others similarly situated (the "Class Members"), against MGM Resorts International ("Defendant" or "MGM") alleging as follows, based upon information and belief, investigation of counsel, and personal knowledge of Plaintiff.

## I.    INTRODUCTION

1.    This is a data breach class action brought on behalf of consumers whose sensitive personal information was stolen by cybercriminals in a massive cyber-attack on MGM on or around September 10, 2023 (the "Data Breach"), and whose information is still at risk because of MGM's history of lax cybersecurity. MGM has not disclosed the number of individuals impacted by the Data Breach, but upon information and belief, the Data Breach likely involves millions of consumers.[1]

2.    MGM has also not yet disclosed what information was taken in the Data Breach. Upon information and belief, the information stolen likely included the full names, dates of birth, addresses, driver's licenses, and Social Security numbers (collectively "PII") of the Plaintiff and similarly situated individuals.[2]

3.    Reportedly, the cyber-attack was conducted by at least two separate cybercriminal organizations working in tandem. The first group, Scattered Spider, thought to be mostly made up of individuals in their late teens and early 20s, specializes in gaining access credentials to a target's data systems by impersonating people in the organization through convincing phone calls.[3] The second group, ALPHV (aka "Blackcat"), specializes in ransomware attacks using sophisticated technical means.[4]

---

[1] https://www.vox.com/technology/2023/9/15/23875113/mgm-hack-casino-vishing-cybersecurity-ransomware (last accessed Sept. 26, 2023).

[2] https://www.reuters.com/business/casino-giant-caesars-confirms-data-breach-2023-09-14/ (last accessed Sept. 26, 2023).

[3] https://www.vox.com/technology/2023/9/15/23875113/mgm-hack-casino-vishing-cybersecurity-ransomware (last accessed Sept. 26, 2023).

[4] https://cybernews.com/security/mgm-cyberattack-claimed-alphv-blackcat-ransomware-group/ (last accessed Sept. 26, 2023).

4.      Beginning on or around September 10, 2023 Scattered Spider reportedly gained access to Defendant's network by impersonating an employee of Defendant and calling Defendant's IT help desk to obtain credentials, which enabled the attackers to access and infect Defendant's systems.[5] The cybercriminal group then proceeded to download over six terabytes of data from Defendant's data systems.[6] Scattered Spider then reportedly employed the ransomware services of ALHPV to demand a ransom from MGM to be paid in crypto currency.[7]

5.      Defendant is "an S&P 500 global gaming and entertainment company with national and international locations featuring best-in-class hotels and casinos, state-of-the-art meetings and conference spaces, incredible live and theatrical entertainment experiences, and an extensive array of restaurant, nightlife and retail offerings."[8] Defendant also offers customers the opportunity to join its MGM Rewards program which enables members to "earn rewards for your hotel stays, dining, slots, table games, and more."[9]

6.      Individuals, including Plaintiff and Class Members, were customers of Defendant's gaming and entertainment services and/or members of Defendant's MGM Rewards program. Defendant requires individuals, including the Plaintiff and Class Members, to provide highly sensitive PII as a prerequisite to use Defendant's entertainment services and to join the MGM Rewards loyalty program. As an incentive to provide this information, Defendant's loyalty program allows it members to obtain points that may be exchanged for program rewards. Plaintiff and Class Members had a reasonable expectation and understanding that Defendant would adopt reasonable data security safeguards to protect PII. Defendant failed to do so, leading to the Data Breach.

---

[5] https://www.vox.com/technology/2023/9/15/23875113/mgm-hack-casino-vishing-cybersecurity-ransomware (last accessed Sept. 27, 2023).
[6] https://www.reuters.com/business/casino-giant-caesars-confirms-data-breach-2023-09-14/ (last accessed Sept. 26, 2023).
[7] https://www.vox.com/technology/2023/9/15/23875113/mgm-hack-casino-vishing-cybersecurity-ransomware (last accessed Sept. 26, 2023).
[8] https://www.mgmresorts.com/en/company.html (last accessed Sept. 27, 2023).
[9] https://www.mgmresorts.com/en/mgm-rewards.html (last accessed Sept. 27, 2023).

7. By obtaining, using, and deriving a benefit from Plaintiff's and Class Member' PII, MGM assumed legal and equitable duties to Plaintiff and Class Members to safeguard that information and knew, or should have known, they were responsible for protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure. MGM owed a non-delegable duty to Plaintiff and Class Members to implement reasonable and adequate security measures to protect their PII. Yet, MGM maintained this PII in a negligent and/or reckless manner and maintained the PII in a condition which left it vulnerable to cyberattacks.

8. The Data Breach was a direct result of MGM's failure to implement reasonable data security measures to protect Class Members' PII against unauthorized intrusions and access.

9. MGM assures its customers, and its MGM Rewards program members, in its Privacy Policy prior to the Data Breach that it uses "industry standard security measures" and that its employees take "reasonable measures to ensure that unauthorized persons cannot view or access your Personal Information."[10] These representations are false and misleading.

10. Plaintiff and Class Members have been damaged in several ways by MGM's previous and ongoing conduct. First, although MGM tells the world that it takes data security very seriously,[11] lulling consumers into trusting its cybersecurity practices, it has a history of negligence with customer PII. MGM previously experienced a data breach in 2019, stating that the breach impacted only 10.6 million consumers.[12] In reality, the data breach was much larger, and information from 142,479,937 MGM customers went on the sale on the dark web in July 2020.[13] Individuals who stay at MGM resorts or partake in activities at MGM properties should feel secure when MGM collects their information as a required part of their stay or activities. MGM's ongoing failure to use reasonable cybersecurity and implement basic controls continues to put individuals

---

[10] https://www.mgmresorts.com/en/privacy-policy.html (last accessed Sept. 26, 2023).
[11] https://www.nbcnews.com/news/us-news/mgm-hack-exposes-data-10-million-including-government-officials-n1139336 (last accessed Sept. 28, 2023).
[12] https://www.zdnet.com/article/exclusive-details-of-10-6-million-of-mgm-hotel-guests-posted-on-a-hacking-forum/ (last accessed Sept. 28, 2023).
[13] https://www.zdnet.com/article/a-hacker-is-selling-details-of-142-million-mgm-hotel-guests-on-the-dark-web/ (last accessed Sept. 28, 2023).

at risk for data breaches.

11.    Second, Plaintiff and Class Members have been exposed to an increased risk of fraud, identity theft, and other misuse of their PII as a result of MGM's poor cybersecurity. Plaintiff and Class Members must now and indefinitely closely monitor their financial and other accounts to guard against fraud. This is a burdensome and time-consuming activity expressly recommended by MGM in previous data breaches in light of the increased risk of fraud. To protect themselves from this increased risk of fraud, Plaintiff and Class Members may be forced to purchase credit monitoring and other identity protection services, purchased credit reports, place credit freezes and fraud alerts on their credit reports (another step previously recommended by MGM), and spend time investigating and disputing fraudulent or suspicious activity on their accounts. Plaintiff and Class Members have also suffered "benefit of the bargain" damages because they paid money to MGM for services that were intended to be accompanied by adequate data security but were not. Plaintiff and Class Members also suffered a "loss of value of PII" resulting from the Data Breach.

12.    PII stolen in the Data Breach can be misused on its own or can be combined with personal information from other sources (such as publicly available information, social media, etc.) to create a package of information capable of being used to commit further identity theft. Thieves can also use the stolen PII to send spear-phishing emails or texts to Class Members to trick them into revealing sensitive information such as Social Security numbers, financial account numbers, login credentials, and the like. Thieves can also send texts and emails embedded with ransomware. Indeed, in the weeks following the Data Breach, Plaintiff received at least one such spam, phishing text message.

13.    Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated consumers whose PII was stolen in the Data Breach. Plaintiff seeks remedies including: (i) compensation for the theft and misuse of their data; (ii) reimbursement of out-of-pocket costs; (iii) compensation for time spent responding to the Data Breach; (iv) comprehensive identify protection services paid for by MGM; (v) injunctive relief requiring substantial improvements to MGM's data security practices, as detailed below.

## II.    PARTIES

### A.    Plaintiff

14.    Plaintiff David Lackey is a natural person, resident, and citizen of the State of Virginia.

15.    Defendant MGM obtained and continues to maintain the PII of Plaintiff via his participation in the MGM Rewards membership program. Plaintiff has no choice but to provide his PII to Defendant to participate in the program.  Defendant owed Plaintiff a legal duty and obligation to protect his PII from unauthorized access and disclosure. Plaintiff's PII was compromised and disclosed as a result of Defendant's inadequate data security practices, which resulted in the Data Breach.

16.    Plaintiff has been a member of the MGM Rewards membership program for over twenty years.  He has attended and used his MGM Rewards membership at MGM locations in Las Vegas, Nevada and in Oxon Hill, MD.

### B.    Defendant

17.    Defendant MGM Resorts International is a publicly traded company incorporated in Delaware with its headquarters at 3600 Las Vegas Boulevard South, Las Vegas, NV 89109. It is a global hospitality and entertainment company that owns, operates, and manages hotels, casinos, and resorts located predominantly in Nevada. MGM's portfolio of Nevada hotels includes MGM Grand, Aria, Bellagio, Delano, Excalibur, Luxor, Mandalay Bay, Park MGM, New York-New York, Park MGM, Signature at MGM Grand, and Vdara. MGM's portfolio of hotels outside of Nevada includes MGM Grand Detroit in Detroit, Michigan; Beau Rivage in Biloxi, Mississippi; Gold Strike Tunica in Tunica, Mississippi (until its disposition in February 2023); Borgata in Atlantic City, New Jersey; MGM National Harbor in Prince George's County, Maryland; and MGM Springfield in Springfield, Massachusetts.[14] MGM's net revenue in 2022 was $13 billion

---

[14]  *See* MGM Resorts International Form 10-K for the year ended Dec. 31, 2022, at pg. 3-4, 8, 60, *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0000789570/5e924681-e9c4-4bfb-95db-ef7c484303e7.pdf (last visited Sept. 26, 2023).

and net income was approximately 1.4 billion.

## III.    JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over the action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs, there are more than 100 Class Members, and Plaintiff and at least one Class member is a citizen of a state different than Defendant.

19.    This Court has diversity jurisdiction over Plaintiff's claims pursuant to 29 U.S.C. § 1332(a)(1) because Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000.

20.    This Court has general personal jurisdiction over MGM because MGM maintains its principal place of business in this District. This Court also has specific personal jurisdiction over MGM because MGM engaged in the conduct underlying this action in this District, including the collection, storage, and inadequate safeguarding of Plaintiff's PII.

21.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. MGM is based in this District, entered into consumer transactions with Plaintiff in this District, and made its data security decisions leading to the Data Breach in this District.

## IV.    STATEMENT OF FACTS

### A.    The MGM Data Breach

22.    On September 11, 2023, MGM released a statement, via Twitter/X, that it had identified a cybersecurity incident affecting many of its systems, and that it was investigating the matter.[15] The cyberattack was so severe that it forced MGM to shut down many of its services for 10 days—including its electronic room card systems, its gaming devices (like slot machines), and

---

[15]https://twitter.com/MGMResortsIntl/status/1701256032369164399?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1701256032369164399%7Ctwgr%5Ebd2523f4ae5a90adbd166512a6dd1eb6556ac4bd%7Ctwcon%5Es1_&ref_url=https%3A%2F%2Fwww.reuters.com%2Ftechnology%2Fmoodys-says-breach-mgm-is-credit-negative-disruption-lingers-2023-09-13%2F (last accessed Sept. 26, 2023).

even some of its websites.[16] Certain MGM services, including MGM Rewards, remain offline.[17] The cyberattack, reportedly, also impacted MGM's ability to accurately meet its payroll obligations, with employees claiming that MGM shorted their paychecks after the breach.[18]

23.    After MGM announced the security incident, two cybercriminal groups took credit for the cyberattack. Although there are conflicting reports, the two organizations, Scattered Spider and ALPHV (aka Blackcat), reportedly worked together to gain access to MGM's systems and extract the PII in MGM's possession. To do so, the two groups used a combination of simple social engineering techniques and sophisticated technical means.[19]

24.    Scattered Spider, a group that specializes in social engineering attacks, reportedly obtained login credentials to MGMs' systems by impersonating an employee on a call with the company's IT department, relying on information found on the employee's LinkedIn profile.[20] Since the Data Breach, the chief security officer of MGM's IT vendor Okta, David Bradbury, confirmed that the attack did include a social engineering component.[21]

25.    After gaining access to MGM's systems, according to Bradbury, ALHPV was able to then deploy its own identity provider and user database into MGM's Okta systems.[22] In this highly technical and sophisticated attack, ALPHV itself claims that it used its access to the Okta servers to obtain additional credentials for MGMs' various data systems.[23]

---

[16] https://www.vox.com/technology/2023/9/15/23875113/mgm-hack-casino-vishing-cybersecurity-ransomware (last accessed Sept. 26, 2023).

[17] https://www.mgmresorts.com/en/maintenance/mgm-rewards.html (displaying the message: "MGM Rewards accounts are currently unavailable. Thank you for your patience.") (last visited Sept. 27, 2023).

[18] https://www.fox5vegas.com/2023/09/19/employee-mgm-resorts-property-says-some-paychecks-short-amid-cybersecurity-breach/ (last accessed Sept. 26, 2023).

[19] https://www.darkreading.com/application-security/okta-flaw-involved-mgm-resorts-breach-attackers-claim (last accessed Sept. 26, 2023).

[20] https://www.vox.com/technology/2023/9/15/23875113/mgm-hack-casino-vishing-cybersecurity-ransomware (last accessed Sept. 25, 2023).

[21] https://www.darkreading.com/application-security/okta-flaw-involved-mgm-resorts-breach-attackers-claim (last accessed Sept. 25, 2023)

[22] *Id.*

[23] *Id.*

26.     The two groups were able to use the information obtained in the cyberattack to allegedly steal at least six terabytes of data from MGM's data systems, which, on information and belief, includes highly sensitive PII of the Plaintiff and Class Members.[24] After obtaining the data, the cyber criminals demanded that the Defendant pay a ransom, a tactic recently successful in a ransomware attack on MGM competitor Caesars Entertainment. But, to date MGM has not announced any ransom payment or any attempt to engage with the two groups responsible for the attack.[25]

27.     MGM knew its systems were vulnerable to a ransomware attack like this, as its IT security vendor Okta specifically warned its customers in August 2023 of potential social engineering attacks:

> In recent weeks, multiple US-based Okta customers have reported a consistent pattern of social engineering attacks against their IT service desk personnel, in which the caller's strategy was to convince service desk personnel to reset all multi-factor authentication (MFA) factors enrolled by highly privileged users … The attackers then leveraged their compromise of highly privileged Okta Super Administrator accounts to abuse legitimate identity federation features that enabled them to impersonate users within the compromised organization.[26]

28.     Even though Okta had warned Defendant of this vulnerability, Defendant did not ensure that reasonable security measures were put in place to protect the sensitive information of the Plaintiff and Class Members, and permitted the attackers to access, and steal, the PII in Defendant's possession.

29.     Although MGM has not disclosed the precise nature of the data obtained in the Data Breach, upon information and belief, the data likely consists of PII including names, addresses, phone numbers, email addresses, and dates of birth, as well as driver's license numbers, and social

---

[24] https://www.reuters.com/business/casino-giant-caesars-confirms-data-breach-2023-09-14/ (last accessed Sept. 26, 2023).
[25] https://www.darkreading.com/application-security/okta-flaw-involved-mgm-resorts-breach-attackers-claim (last accessed Sept. 26, 2023).
[26] https://www.darkreading.com/application-security/okta-flaw-involved-mgm-resorts-breach-attackers-claim (last accessed Sept. 26, 2023).

security numbers.[27] Cyber security journalists have recognized that such PII stolen in a previous Data Breach by MGM represents a "treasure trove" of "highly sensitive" personal information, and that affected consumers now face a risk of misuse of their PII.[28] Yet, at this time, MGM has not disclosed the number of individuals impacted by the Data Breach or what systems were impacted by the Data Breach.

30.    As a multi-billion-dollar publicly traded company, MGM had the financial wherewithal and personnel necessary to prevent the Data Breach. Nevertheless, MGM failed to adopt adequate data security measures.

31.    As a condition of joining MGM's loyalty program, staying at its hotels, or otherwise using its services, MGM requires that its customers entrust it with highly sensitive PII. MGM retains and stores this information to use it for marketing purposes, among other things. By obtaining, collecting, and deriving a benefit from its customers' PII, MGM assumed legal and equitable duties to take reasonable measures to protect their PII. MGM failed to do so, despite the known risk of theft by cyber criminals.

**B.    Criminals Will Continue to Use the Stolen PII for Years**

32.    The risk of fraud following a data breach like this one persists for years. Identity thieves often hold stolen data for months or years before using it, to avoid detection and maximize profits. Also, the sale of stolen information on the dark web may take months or more to reach end-users, in part because data is often broken into smaller batches when sold or re-sold to appeal to different types of buyers. In addition, stolen data may be distributed through off-line criminal networks and syndicated to be used for crime near where the victim resides.

---

[27] https://www.reuters.com/business/casino-giant-caesars-confirms-data-breach-2023-09-14/ (last accessed Sept. 26, 2023).

[28] *See Details of 10.6 Million MGM Hotel Guests Posted on a Hacking Forum*, ZDNet, Feb. 19, 2020, *available at* https://www.zdnet.com/article/exclusive-details-of-10-6-million-of-mgm-hotel-guests-posted-on-a-hacking-forum/ (last visited Sept. 26, 2023); *accord MGM Resorts Hack Exposes Details of 10.6 Million Guests*, Fortune, Feb. 20, 2020, *available at* https://fortune.com /2020/02/20/mgm-resorts-hack-data-breach-10-6-million-guests/ ("Identity theft is the big threat here.") (last visited Sept. 26, 2023).

33.    According to a Government Accountability Office Report, the threat of future identity theft lingers for a substantial period of time after a data breach given the time lag between when information is stolen and when it is used:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft.  Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.  As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[29]

34.    Another source, discussing a previous MGM breach, stated: "[A]s with many breaches, malicious actors sometimes wait months or years to tip their hand. . . .  This is a great example of how these breaches and their fallout can continue to haunt businesses for quite some time. . . ."[30]

35.    Accordingly, Class Members may not see the full extent of identity theft or misuse of their personal information for years to come. They face an ongoing risk and must vigilantly monitor their financial and other accounts indefinitely.

36.    Moreover, even after Class Members' PII is misused, it may take months or years for them to become aware of the misuse. This complicates the process of disputing and correcting the misuse of their data.

**C.    PII Stolen in the Data Breach Can be Combined with Data Acquired Elsewhere to Commit Identity Theft**

37.    Identity thieves can combine PII stolen in the Data Breach with information gathered from other sources such as public sources or even the consumer's social media accounts, to commit identity theft. Thieves can then use the combined data profile to commit fraud including,

---

[29] *See Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, United States Government Accountability Office (June 2007), https://www.gao.gov/assets/gao-07-737.pdf (last visited Sept. 26, 2023).

[30] *See MGM Admits to 2019 Data Breach Affecting 10.6 Million Customers*, SC Magazine, Feb. 20, 2020, *available at* https://www.scmagazine.com/news/mgm-admits-to-2019-data-breach-affecting-10-6-million-customers (last visited Sept. 26, 2023).

among other things, opening new financial accounts or taking out loans in the consumer's name, using the consumer's information to obtain government benefits, filing fraudulent tax returns using the consumer's information and retaining the resulting tax refunds, obtaining a driver's licenses in the consumer's name but with another person's photograph, and giving false information to police during an arrest.

38.    A federal district court has explained the process as follows:

> The threat of identity theft is exacerbated by what hackers refer to as "fullz packages." A fullz package is a dossier that compiles information about a victim from a variety of legal and illegal sources. Hackers can take information obtained in one data breach and cross-reference it against information obtained in other hacks and data breaches. So, for example, if a hacker obtains a victim's . . . health information from UnityPoint, the hacker can combine it with the same victim's Social Security number and phone number from a different data breach. This allows the hacker to compile a full record of information about the individual, which the hacker then sells to others as a package.

*Fox v. Iowa Health Sys.*, 399 F. Supp. 3d 780, 789 (W.D. Wis. 2019).

39.    Thieves can also use PII from the Data Breach, alone or in combination with other information about the consumer, to send highly targeted spear-phishing emails to the consumer to obtain more sensitive information. Spear phishing involves sending emails that appear legitimate and are accompanied by correct personal and other information about the individual. Lulled by a false sense of trust and familiarity from a seemingly valid sender (for example Bank of America, Amazon, or even a government entity), the individual provides sensitive information as requested in the email. This could include login credentials, account numbers, or various other types of information.

40.    Identity thieves can also use PII from the Data Breach in a "SIM swapping" attack to take control of consumers' phone numbers, allowing them to bypass 2-factor authentication to access the consumer's most sensitive accounts. In other words, fraudsters can use breached PII to convince the consumer's mobile phone carrier to port-over the person's mobile phone number to a phone that the hacker controls. A journalist discussing a previous MGM Data Breach described this scheme as follows:

Exposed phone numbers create an additional risk: SIM swapping. In these scams, criminals use the data they've gathered about a potential victim to convince wireless carriers to move a number to a different phone. The goal is to intercept two-factor authentication codes that are delivered by SMS.[31]

**D.    MGM Uses Consumers' PII for Profit-Generating Purposes**

41.    Consumers' PII is also valuable to MGM. MGM recognizes a business value of PII and collects it to better target customers and increase its profits.

42.    MGM acknowledges that it uses consumers' PII for the following purposes:

**Marketing Purposes.** We may use the information we collect for our own marketing purposes including notifying you of special promotions, offers, and events via e-mail, direct mail, social media, telephone, text message, push notifications, in-room notifications, and other means....

**Non-Marketing Purposes.** We may use the information we collect for non-marketing purposes including . . . (2) recording and accessing gaming-related activity . . . ; (3) conducting internal research, analytics, and statistical or demographic analysis; . . . (6) customizing your experience while visiting . . . MGM Resorts; (7) protecting and defending MGM Resorts International and its affiliates against legal actions or claims; . . . [and] (9) collecting debt.

…. We may also link Personal Information with other generally or publicly available information to help us identify your preferences or interests. The information we collect may also be merged with information available from other sources such as (1) companies that match e-mail addresses with postal addresses and other information; . . . and (3) other subsidiaries, resorts, casinos, or properties that are owned, operated, or affiliated with MGM Resorts International (each a "MGM Subsidiary")."

\*        \*        \*

**Sharing with Business Partners and Other Third Parties.** We may share the information we collect with our business partners and other third parties for joint marketing purposes or our business partners' (or our own) marketing purposes.[32]

43.    MGM's self-serving motive to retain and mine its customers' PII led to MGM holding a trove of customer data. MGM was unjustly enriched by retaining consumers' PII for its

---

[31]  *See For Sale: Hacked Data On 142 Million MGM Hotel Guests*, Forbes, July 14, 2020, *available at* https://www.forbes.com/sites/leemathews/2020/07/14/mgm-142-million-guests-hacked/?sh=1ca9d7125294 (last visited Sept. 26, 2023).

[32]  *See* https://www.mgmresorts.com/en/privacy-policy.html, at § 3 (last visited Sept. 26, 2023).

own profit motive, while failing to adopt reasonable data security measures to protect that PII.

**E.    Plaintiff and Class Members Suffered Damages**

44.    MGM's failure to keep the PII of Plaintiff and Class Members secure has severe ramifications. Plaintiff and Class Members face a high risk of misuse of their PII from the Data Breach. Upon information and belief, the hackers stole PII from MGM with the specific intent to use it for illicit purposes and/or sell it to others to be misused. And the hackers have carried out this intent by using the data to demand a ransom payment from the Defendant.

45.    Plaintiff and Class Members have already incurred or will incur out of pocket costs as a result of the Data Breach.

46.    Plaintiff and Class Members have spent and will continue to spend significant amounts of time monitoring their financial and other accounts for fraud, researching and disputing suspicious or fraudulent activity, obtaining and reviewing credit reports, placing credit freezes on their credit profiles, dealing with spam and phishing emails, text messages, and phone calls, and reviewing their financial affairs more closely than they otherwise would have, among other things. These efforts are burdensome and time-consuming and would not have been necessary but for MGM's data security shortfalls.

47.    Even in instances where a Class Member is reimbursed for a financial loss due to fraud, that does not make the individual whole again because there is typically significant time and effort associated with seeking reimbursement. The Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" relating to fraud and identity theft.[33]

**1.    Loss of Value of PII**

48.    Plaintiff and Class Members have also suffered a "loss of value of PII."

49.    A robust market exists for stolen PII, which is sold and distributed on the dark web

---

[33] *See Victims of Identity Theft*, U.S. Dept. of Justice, Nov. 13, 2017, *available at* http://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited Sept. 27, 2023).

and through illicit criminal networks at specific, identifiable prices. Cybercriminals routinely market stolen PII online, making the information widely available to criminals across the world.

50.    For example, stolen driver's license numbers can be sold for between $10 and $35 each.[34]

51.    Stolen PII is a valuable commodity to identity thieves. The purpose of stealing large blocks of PII, is to use it to for illicit purposes or to sell it and profit from other criminals who buy the data and misuse it.

52.    The U.S. Attorney General stated in 2020 that consumers' sensitive personal information commonly stolen in data breaches "has economic value."[35] The Information Commissioner's Office in the European Union, when investigating a hotel data breach at Marriott, noted that "[p]ersonal data has a real value so organi[z]ations have a legal duty to ensure its security."[36]

53.    Nevada law, too, acknowledges that personal information has intrinsic monetary value. Specifically, Nev. Rev. Stat. § 597.810 provides for statutory damages of $750 for unauthorized commercial use of a person's name, voice photograph, or likeness by companies conducting business in Nevada.

54.    The value of personal information is increasingly evident in our digital economy. Many companies, including MGM, collect personal information for purposes of data analytics and marketing. MGM recognizes the value of personal information, collects it to better target

---

[34] *See* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Sept. 27, 2023); https://www.keepersecurity.com/how-much-is-my-information-worth-to-hacker-dark-web.html (last visited Sept. 27, 2023).
[35]  *See Attorney General William P. Barr Announces Indictment of Four Members of China's Military for Hacking into Equifax*, U.S. Dep't of Justice, Feb. 10, 2020, *available at* https://www.justice.gov/opa/speech/attorney-general-william-p-barr-announces-indictment-four-members-china-s-military (last visited Sept. 27, 2023).
[36]  *See Intention to Fine Marriott International, Inc More Than £99 Million Under GDPR for Data Breach*, ICO News, July 9, 2019, *available at* https://edpb.europa.eu/news/national-news/2019/ico-statement-intention-fine-marriott-international-inc-more-ps99-million_en.    (last visited Sept. 27, 2023).

customers to increase its profits, and shares it with third parties for similar purposes, discussed above.

55.    One author has noted: "Due, in part, to the use of PII in marketing decisions, commentators are conceptualizing PII as a commodity. Individual data points have concrete value, which can be traded on what is becoming a burgeoning market for PII."[37]

56.    Consumers also recognize the value of their personal information and offer it in exchange for goods and services. The value of PII can be derived not by a price at which consumers themselves seek to sell it, but rather in the economic benefit consumers derive from being able to use it. A consumer's ability to use their PII is encumbered when their identity or credit profile is infected by misuse or fraud. For example, a consumer with false or conflicting information on their credit report may be denied credit. Also, a consumer may be unable to open an electronic account where their email address is already associated with another user. In this sense, among others, the theft of PII leads to a diminution in value of the PII.

### 2.    Benefit of Bargain Damages

57.    Plaintiff and Class Members also suffered "benefit of the bargain" damages.

58.    Plaintiff overpaid for MGM's services that should have been – but were not – accompanied by adequate data security.  One component of the cost of Class Members' use of MGM's services was the implicit promise MGM made to protect Class Members' PII.

59.    Part of the price consumers paid to MGM was intended to be used to provide adequate data security.  MGM did not do so.  Thus, consumers did not get what they paid for.

60.    Because of the value consumers place on data privacy and security, companies with robust data security practices can command higher prices than those that do not, and vice versa. Indeed, if consumers did not value data security and privacy, MGM would have no reason to tout its data security efforts in its Privacy Policy.

---

[37]    *See* John T. Soma, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ('PII') Equals the "Value" of Financial Assets*, 15 Rich. J. L. & Tech. 11, 14 (2009).

61.     Had consumers known the truth about MGM's deficient data security practices, they would not have stayed at MGM properties or would have paid less than they did for their rooms.

62.     Plaintiff and Class Members did not receive the benefit of their bargain because they paid for data security safeguards they expected but did not receive.

63.     Plaintiff and Class Members are entitled to monetary compensation for the various types of damages discussed above.

64.     They are also entitled to payment for a robust set of identity protection services, including credit monitoring. Such services are reasonable and necessary here. The stolen PII is historical in nature and can be used for identity theft and other types of financial fraud. There is no question that the PII was taken by sophisticated cybercriminals, increasing the risks to Class Members. The consequences of identity theft are serious and long-lasting. There is a benefit to early detection and monitoring. Experts recommend that data breach victims obtain identity protection services for many years after a data breach. Annual subscriptions for comprehensive identity protection services that include three-bureau credit monitoring, alerts on credit inquiries and new account openings, fraud resolution services, dark web monitoring, and identity theft insurance range from $219 to $329 per year. [38] MGM must provide monetary compensation to Class Members to pay for these services for their lifetimes.

**F.      Plaintiff and Class Members are Entitled to Injunctive Relief**

65.     MGM acted on grounds that apply generally to the Class as a whole. Thus, injunctive relief is appropriate on a class-wide basis.

66.     Plaintiff and Class Members are entitled to injunctive relief requiring MGM to, among other things:

(a)     Strengthen its technical and administrative information security controls and

---

[38] *See* Robert McMillan & Deepa Seetharaman, *Facebook Finds Hack Was Done By Spammers, Not Foreign State,* The Wall Street Journal (Oct. 17, 2018), *available at* https://www.wsj.com/articles/facebook-tentatively-concludes-recent-hack-was-perpetrated-by-spammers-1539821869  (last visited Sept. 27, 2023).

adequately fund them for several years;

(b)    Submit to regular, independent System and Organization Controls 2 ("SOC 2") Type 2 audits of its enterprise data networks and all security-relevant systems, with scoping and assertion statement established by an independent assessor;

(c)    Promptly implement all remediation measures recommended by the SOC 2, Type 2 assessor and any other forensic analysis or incident response entities retained to address the Data Breach;

(d) Implement tokenization or column-level encryption of sensitive PII in all databases;

(e) delete all PII from non-production database environments.

67.    These measures are necessary to guard against future data breaches at MGM involving Class Members' PII that MGM continues to retain.

### G.   Plaintiff's Experience

68.    Plaintiff David Lackey is a current rewards member with Defendant MGM. Plaintiff joined Defendant's rewards program over twenty years ago. In the past year, Plaintiff has, on several occasions, visited MGM National Harbor in Oxon Hill, Maryland and also visits MGM properties in Las Vegas, Nevada.

69.    To obtain an MGM Rewards membership, Plaintiff was required to provide his PII to Defendant, including his name, full address, date of birth, and Social Security number.

70.    Upon information and belief, Defendant received and maintains the information Plaintiff was required to provide to obtain his MGM Rewards Membership.

71.    Plaintiff is very careful with his PII. He stores any documents containing his PII in a safe and secure location or destroys the documents. Plaintiff has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Moreover, Plaintiff diligently chooses unique usernames and passwords for his various online accounts.

72.    As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, and monitoring his credit.

73.     Because MGM has provided no notice to Plaintiff or class members concerning how to protect themselves after the data breach, Plaintiff and class members expended reasonable efforts protecting themselves, including following guidance from the Federal Trade Commission.[39]

74.     Plaintiff was forced to spend multiple hours attempting to mitigate the effects of the Data Breach. He will continue to spend valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This is time that is lost forever and cannot be recaptured.

75.     Despite these efforts, Plaintiff noticed that he received increased text phishing attempts from multiples sources in the weeks following the Data Breach.

76.     Plaintiff suffered actual injury and damages from having his PII compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of his PII, a form of intangible property that MGM obtained from Plaintiff; (b) violation of his privacy rights; (c) the theft of his PII; (d) loss of time; (e) imminent and impending injury arising from the increased risk of identity theft and fraud; (f) failure to receive the benefit of his bargain; and (g) nominal and statutory damages.

77.     Plaintiff has also suffered emotional distress that is proportional to the risk of harm and loss of privacy caused by the theft of his PII, which he believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his PII for purposes of identity theft and fraud. Plaintiff has also suffered anxiety about unauthorized parties viewing, using, and/or publishing information related to his Social Security number.

78.     As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff will continue to be at present, imminent, and continued increased risk of identity theft and fraud in perpetuity.

---

[39] *See* https://consumer.ftc.gov/media/79862 (last accessed Sept. 28, 2023).

79.     Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**H.     MGM's Privacy Policy**

80.     MGM's Privacy Policy on its website touted its data security safeguards. The Privacy Policy made materially false and misleading representations and omissions to Class Members. The version of MGM's Privacy Policy prior to the Data Breach stated the following, in relevant part:

**Privacy Policy**

MGM . . . respects your privacy. This Privacy Policy ("Policy") describes the information collection, use, protection, and sharing practices of MGM Resorts International and MGM Resorts International web sites, mobile applications, electronic communications, and properties described below ….

*       *       *

We collect information from a variety of sources and in a variety of ways, including but not limited to, the following:

**A. Personal Information**.  When you visit, use and/or access MGM Resorts or MGM Online Services … , you might provide us with, (and/or we may collect) information by which you can be personally identified including your name, date of birth, postal address, e-mail address, telephone number, videos, recordings, and images of you ("Personal Information")..  We may also obtain Personal information from third parties.

*       *       *

**E. Sensitive Information.**  When you make a purchase, visit, use and/or access MGM Resorts or MGM Online Services, or engage in other transactions or activities, you may provide us with sensitive Personal information including your credit or debit card number, financial account number, biometrics, medical/health-related information, driver's license number, government-issued identification card number, social security number, passport number, naturalization number, precise geolocation, racial or ethnic origin, religious or philosophical beliefs, union membership, genetic data, sex life or sexual orientation, or citizenship or immigration status ("Sensitive Information").

*       *       *

### 9. SECURITY

Information maintained in electronic form that is collected by MGM Resorts International and any individual MGM Resort is stored on **systems protected by industry standard security measures**. These security measures are intended to **protect these systems from unauthorized access**. . . . **We have controls in place that are designed to detect potential data breaches, contain and minimize the loss of data**, and conduct forensic investigations of a breach.

**Our staff is required to take reasonable measures to ensure that unauthorized persons cannot view or access your Personal Information**. Employees who violate our privacy policies are subject to disciplinary action, up to and including termination of employment.

\*        \*        \*

As a standard security practice, we take reasonable steps which are generally recognized in the industry to ensure that the communication methods used to support MGM Online Services do not permit connections or communication by methods that have known security weaknesses or vulnerabilities.[40]

81.    These representations were misleading because, among other things, MGM did not employ "industry standard security measures" and did not take "reasonable measures to ensure that unauthorized persons cannot view or access your Personal Information."

82.    The Privacy Policy also contained material omissions because it failed to disclose that MGM's data security practices had significant shortfalls regarding its cloud server that held consumers' PII.

83.    Plaintiff and Class Members provided their PII to MGM with the reasonable expectation and mutual understanding that MGM would take reasonable steps to secure the PII from theft. MGM failed to do so, in violation of its Privacy Policy and other legal duties discussed below.

---

[40]   *See* https://www.mgmresorts.com/en/privacy-policy.html (emphasis added) (last visited Sept. 27, 2023).

**I.      MGM Failed to Comply with Established Cybersecurity Frameworks and Industry Standards.**

84.      The FTC has promulgated various guides for businesses, which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[41]

85.      In 2016, the FTC updated its publication titled *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses.[42] The guidelines noted that:

a)      Businesses should promptly dispose of personal identifiable information that is no longer needed, and retain sensitive data "only as long as you have a business reason to have it";

b)      Businesses should encrypt sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

c)      Businesses should thoroughly understand the types of vulnerabilities on their network and how to address those vulnerabilities;

d)      Businesses should install intrusion detection systems to promptly expose security breaches when they occur; and

e)      Businesses should install monitoring mechanisms to watch for large troves of data being transmitted from their systems.

86.      In another publication, the FTC recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require

---

[41] *See Start With Security: A Guide for Business*, Federal Trade Commission, June 2015, *available at* https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business (last visited Sept. 27, 2023).

[42] *See Protecting Personal Information: A Guide for Business*, Federal Trade Commission, Oct. 2016, *available at* https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business (last visited Sept. 27, 2023).

complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[43]

87.    The FTC has brought many enforcement actions against businesses for failing to adequately protect customer data.

88.    Importantly for current purposes, the FTC treats the failure to employ reasonable data security safeguards as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

89.    Many states' unfair and deceptive trade practices statutes are similar to the FTC Act, and many states adopt the FTC's interpretations of what constitutes an unfair or deceptive trade practice.

90.    In its 2019 Privacy & Data Security Update, the FTC noted that "[s]ince 2002, the FTC has brought more than 70 cases against companies that have engaged in unfair or deceptive practices involving inadequate protection of consumers' personal data."[44]

91.    In this case, MGM was fully aware of its obligation to use reasonable measures to protect consumers' PII, acknowledging as much in its Privacy Policy. MGM also knew it was a target for hackers. But despite understanding the risks and consequences of inadequate data security, upon information and belief, MGM failed to comply with FTC data security obligations.

92.    MGM's failure to adopt reasonable safeguards to protect PII constitutes an unfair act or practice under Section 5 of the FTC Act, 15 U.S.C. § 45.

93.    Similarly, the National Institute of Standards and Technology (NIST) provides

---

[43] *See Start With Security: A Guide for Business*, Federal Trade Commission, June 2015, *available at* https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business (last visited Sept. 27, 2023).
[44] *See Privacy & Data Security Update: 2019*, Federal Trade Commission, 2020, *available at* https://www.ftc.gov/system/files/documents/reports/privacy-data-security-update-2019/2019-privacy-data-security-report-508.pdf (last visited Sept. 27, 2023).

basic network security guidance enumerating steps to take to avoid cybersecurity vulnerabilities.[45] The NIST guidelines provide valuable insights and best practices to protect network systems and customer data.

94.    NIST guidance includes recommendations for risk assessments, risk management strategies, system access controls, training, data security, network monitoring, breach detection, and mitigation of existing anomalies.[46]

95.    Further, cyber security experts have promulgated a series of best practices that should be implemented by hotels, including the following:

a)    Installing appropriate malware detection software;

b)    Monitoring and limiting network ports;

c)    Protecting web browsers and email management systems;

d)    Setting up network systems such as firewalls, switches and routers;

e)    Monitoring and protection of physical security systems; and

f)    Training hotel staff regarding critical points.[47]

96.    MGM's failure to protect Plaintiff and Class Members' PII illustrates MGM's failure to adhere to the spirit and letter of the FTC guidelines, NIST guidance, and industry best practices.

## J.    Companies like MGM are a Frequent Target of Cyber Criminals, and MGM Was on Notice of the Threat

97.    The type of PII collected by the accommodation industry, makes it particularly appealing to cyber criminals.

---

[45]    *See Framework for Improving Critical Infrastructure Cybersecurity*, National Institute of Standards and Technology (April 16, 2018), Appendix A, Table 2, *available at* https://nvlpubs.nist.gov/nistpubs/CSWP/NIST.CSWP.04162018.pdf (last visited Sept. 27, 2023).
[46]    *Id*. at Table 2 pg. 26-43.
[47]    *See How to Work on Hotel Cyber Security*, Open Data Security, July 23, 2019, *available at* https://opendatasecurity.io/how-to-work-on-hotel-cyber-security/ (last visited Sept. 27, 2023).

98.     Trustwave's "2018 Global Security Report" listed hospitality as one of the top three industries most vulnerable to payment card breaches.[48] Other estimates project that hotels are the targets of around 20% of all cyberattacks.[49]

99.     In its 2018 Data Breach Investigations Report, Verizon noted that 15% of all data breaches occurring in 2017 involved the accommodation and food services industry.[50] The report noted that there were 338 breaches in the accommodation industry in 2017 alone, including at many of the major hotel brands.[51]

100.    In recent years, Choice Hotels, Hard Rock Hotel, Hilton, Hyatt, Kimpton, Marriott, Millennium, Omni, Radisson, Starwood, and Wyndham, among others, have all experienced data breach incidents.[52]

101.    "Such unfortunate trends should not come as much of a surprise since hotels are hotbeds of sensitive information. Their data is spread out across porous digital system…."[53]

102.    'While hospitality companies have fewer transactions than retail organizations – and thus have data on fewer customers to steal – they collect substantially more valuable and varied personal data for each of their guests. . . .  This rich personal data is invaluable to cybercriminals. They can use this data to better impersonate each breached customer, leading to additional identity theft and social engineering attacks . . . .  By enabling further attacks, breaching a hotel provides cybercriminals much more value than breaching a company in almost any other industry."[54]

---

[48] *See Why Cybersecurity Matters*, Hotel Management, Oct. 17, 2019, *available at* https://www.hotelmanagement.net/tech/why-cybersecurity-matters (last visited Sept. 27, 2023).

[49] *Id.*

[50] *See Verizon 2018 Data Breach Investigations Report*, 11th Ed., at pp. 5, 25, 27, *available at* https://enterprise.verizon.com/resources/reports/DBIR_2018_Report.pdf (last visited Sept. 27, 2023).

[51] *Id.*

[52] *See Timeline: The Growing Number of Hotel Data Breaches*, CoStar.com, April 7, 2020, *available at* https://www.costar.com/article/139958097 (last visited Sept. 27, 2023).

[53] *See Why Cybersecurity Matters*, Hotel Management, Oct. 17, 2019, *available at* https://www.hotelmanagement.net/tech/why-cybersecurity-matters (last visited Sept. 27, 2023).

[54] *See Cybersecurity in Hospitality: An Unsolvable Problem?*, Paladion Networks, *available at* https://www.paladion.net/cybersecurity-in-hospitality-an-unsolvable-problem (last visited Sept. 27, 2023).

103. The high risk of data breaches in the hotel industry was widely known throughout the field, including to MGM.

104. Indeed, MGM acknowledged in its December 31, 2018 Form 10-K that there has been an "increase in criminal cyber security attacks against companies where customer and company information has been compromised."[55] Also, MGM's Charter for the Audit Committee of the company's Board of Directors, dated January 17, 2019, noted that one of the Committee's duties was to "[e]stablish and oversee procedures for . . . the Company's plans to mitigate cybersecurity risks and respond to data breaches."[56]

105. Thus, MGM was clearly aware of the high risk of data intrusions and the magnitude of the harm that could result from a breach. Despite the known risks, MGM failed to adopt reasonable safeguards to protect Class Members' PII.

## VI. CLASS ACTION ALLEGATIONS

106. Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3).

### NATIONWIDE CLASS

107. Plaintiff seeks certification of the following nationwide class:

> Nationwide Class: All persons residing in the United States whose PII was acquired by cybercriminals in the MGM Data Breach.

108. The Nationwide Class asserts claims against MGM for Negligence (Count I), Negligent Misrepresentation (Count II), Breach of Implied Contract (Count III), Unjust Enrichment (Count IV), and violation of the Nevada Consumer Fraud Act, Nev. Rev. Stat. § 41.600 (Count V).

109. Under the Restatement (Second) of Conflict of Laws §§ 145 and 188, adopted by

---

[55] *See* MGM Resorts International Form 10-K for the year ended Dec. 31, 2018, at pg. 23, *available at* http://d18rn0p25nwr6d.cloudfront.net/CIK-0000789570/d1b055df-9e21-4013-a311-67c98e2eb16a.pdf (last visited Sept. 27, 2023).

[56] *See* https://s22.q4cdn.com/513010314/files/doc_downloads/committee/MGM-Audit-Committee-Charter-(FINAL).pdf (last visited Sept. 27, 2023).

Nevada courts and applies to the facts here, Nevada substantive law controls the common law tort and contract-based claims of Plaintiff, regardless of Plaintiff's state of residency.

110.    The Nevada Consumer Fraud Act, Nev. Rev. Stat. § 41.600, may be applied on a nationwide basis because MGM's unlawful conduct was centered in Nevada.

111.    In addition or in the alternative, Plaintiff also seeks certification of a statewide subclass under Virginia and Maryland law.

> <u>Virginia Subclass</u>: All residents of Virginia whose PII was acquired by cybercriminals in the MGM Data Breach.

> <u>Maryland Subclass</u>: All residents of Maryland whose PII was acquired by cybercriminals in the MGM Data Breach.

112.    The Subclass asserts state statutory claims for violation of the Virginia's data breach notification law, Va. Code Ann. § 18.2-186.6(B), *et seq.* (Count VI); and Maryland's Consumer Protection Act.

113.    Excluded from the Nationwide Class and all Subclasses (collectively the "Class") are Defendant's executive officers and directors, the judges to whom this case is assigned, their immediate family members, and court room staff.

114.    Plaintiff reserves the right to amend the definitions of the Classes after having an opportunity to conduct discovery.

115.    <u>Numerosity: Fed. R. Civ. P. 23(a)(1)</u>.  Upon information and belief, the Nationwide Class and statewide Subclass are each so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, the class size can be determined by information available in MGM's records, which will be a subject of discovery. On information and belief, there are millions of Class Members in the Nationwide Class, and at least thousands of Class Members in the state Subclass.

116.    <u>Commonality: Fed. R. Civ. P. 23(a)(2)</u>. There are many questions of "law or fact" common to the Class for purposes of Rule 23(a)(2), including but not limited to:

- Whether MGM's data security systems prior to the Data Breach complied

with applicable data security laws, regulations, industry standards, and other relevant requirements;

- Whether MGM owed a duty to Plaintiff and Class Members to safeguard their PII;

- Whether MGM breached its duty to Plaintiff and Class Members to safeguard their PII;

- Whether MGM knew or should have known that its data security systems were deficient prior to the Data Breach;

- Whether MGM detected the Data Breach in a timely manner;

- Whether MGM had a contractual obligation, based on its Privacy Policy or otherwise, to adopt reasonable data security measures;

- Whether MGM failed to provide timely and adequate notice of the Data Breach to Class Members;

- Whether MGM's conduct constituted violations of state consumer protection statutes and state data security and breach notification statutes;

- Whether Plaintiff and Class Members suffered legally cognizable damages as a result of the Data Breach; and

- Whether Plaintiff and Class Members are entitled to injunctive relief.

117. <u>Typicality: Fed. R. Civ. P. 23(a)(3)</u>. Typicality is satisfied because the claims of Plaintiff and all Class Members derive from the same operative facts. Plaintiff and Class Members all had their PII stolen in the Data Breach. Plaintiff and Class Members have the same basic legal claims against MGM.

118. <u>Adequacy of Representation: Fed R. Civ. P. 23(a)(4)</u>. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained competent counsel who are highly experienced in data breach class actions and other complex litigation. Plaintiff and his counsel are committed to prosecuting this action vigorously on behalf of the Class. Plaintiff's counsel have the financial and personnel resources to litigate this matter through all phases of

pretrial litigation, trial, and any necessary appeals. Neither Plaintiff nor their counsel have any interests that are contrary to, or conflict with, those of the Class.

119.    <u>Predominance: Fed. R. Civ. P. 23(b)(3)</u>. MGM has engaged in a common course of conduct toward all Class Members. The common issues identified above arising from MGM's conduct predominate over any issues affecting only individual Class Members. The common issues hinge upon MGM's conduct rather than that of any individual Plaintiff or Class member. Adjudication of the common issues in a single action has important and desirable advantages that will lead to judicial economy.

120.    <u>Superiority: Fed. R. Civ. P. 23(b)(3)</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law of fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would find that the cost of litigating their individual claims is prohibitively high and they would therefore have no realistic means to a remedy on an individual non-class basis. The litigation of separate actions by consumers would create a risk of inconsistent or varying adjudications, which could establish incompatible standards of conduct for MGM. In contrast, conducting this action on a class-wide basis presents fewer management difficulties, conserves judicial and party resources, and pursues the rights of all Class Members in a single proceeding.

121.    <u>Injunctive Relief: Fed. R. Civ. P. 23(b)(2)</u>. MGM acted on grounds that apply generally to the Class as a whole. MGM continues to retain Class Members' PII, which is subject to potential future data breaches in MGM's hands. Injunctive relief is appropriate on a class-wide basis.

VII.    **CAUSES OF ACTION**

**COUNT I**
**NEGLIGENCE**
**(On Behalf of the Nationwide Class or in the Alternative, Negligence According to the Applicable State Subclass)**

122.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully

set forth herein.

123.    As a condition of receiving MGM's services, Plaintiff and all Class Members were obligated to provide MGM with their PII.

124.    Plaintiff and Class Members entrusted their PII to MGM with the understanding that MGM would take reasonable measures to safeguard their PII.

125.    MGM had knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could face if their PII was stolen in a data breach.

126.    MGM had a duty to exercise reasonable care in safeguarding, securing, and protecting Class Members' PII. This duty included, among other things, designing, maintaining, and testing MGM's data security procedures to ensure that the PII was adequately protected, that cloud-based safeguards were adequately implemented, and that employees tasked with maintaining PII were adequately trained on cyber security measures.

127.    MGM's duty of care arose from, among other things:

- the special relationship that existed between MGM and its customers because, *e.g.*, MGM was in an exclusive position to ensure that its systems were sufficient to protect against the foreseeable risk that a data breach could occur;

- Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, failing to adopt reasonable data security measures;

- MGM's representations in its Privacy Policy;

- general common law duties to adopt reasonable data security measures to protect customer PII and to act as a reasonable and prudent person under the same or similar circumstances would act; and

- state statutes requiring reasonable data security measures, including but not limited to Nev. Rev. Stat. § 603A.210, which states that businesses possessing personal information of Nevada residents "shall implement and

maintain reasonable security measures to protect those records from authorized access."

128.    MGM was subject to an "independent duty," untethered to any express contract between MGM and Class Members.  Sources of the independent duty are included in the list above.

129.    MGM's violation of the FTC Act and state data security statutes constitutes negligence *per se* for purposes of establishing the duty and breach elements of Plaintiff's negligence claim. Those statutes were designed to protect a group to which Plaintiff belongs and to prevent the type of harm that resulted from the Data Breach.

130.    Plaintiff and Class Members were the foreseeable victims of MGM's inadequate data security practices. MGM knew that a breach of its systems could cause harm to Plaintiff and Class Members.

131.    MGM's conduct created a foreseeable risk of harm to Plaintiff and Class Members. MGM's misconduct included its failure to adequately restrict access to its cloud server that held consumers' PII.

132.    MGM knew or should have known of the inherent risks in collecting and storing PII, the importance of providing adequate data security, and the frequent cyberattacks aimed at the hotel industry.

133.    Plaintiff and Class Members had no ability to protect their PII once it was in MGM's possession and control. MGM was in an exclusive position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

134.    MGM, through its actions and inactions, breached its duties owed to Plaintiff and Class Members by failing to exercise reasonable care in safeguarding their PII while it was in MGM's possession and control.

135.    MGM inadequately safeguarded consumers' PII in deviation of standard industry rules, regulations, and best practices at the time of the Data Breach.

136.    But for MGM's breach of duties, consumers' PII would not have been stolen by a computer hacker.

137.    There is a temporal and close causal connection between MGM's failure to implement adequate data security measures, the Data Breach, and the harms suffered by Plaintiff and Class Members.

138.    As a result of MGM's negligence, Plaintiff and Class Members suffered and will continue to suffer the various types of damages alleged herein.

139.    Due to Defendant's conduct, Plaintiff and Class Members are entitled to credit monitoring. Credit monitoring is reasonable here. The PII taken is historical and can be used towards identity theft and other types of financial fraud against the Class Members. There is no question that this PII was taken by sophisticated cybercriminals increasing the risks to the Class Members. The consequences of identity theft are serious and long-lasting. There is a benefit to early detection and monitoring. Some experts recommend that data breach victims obtain credit monitoring services for many years after a data breach. Annual subscriptions for comprehensive credit monitoring plans that include inquiry alerts, credit locks, and identity theft insurance range from $219 to $329 per year.[57]

140.    Plaintiff and Class Members are entitled to all forms of monetary compensation and injunctive relief set forth above.

## COUNT II
### NEGLIGENT MISREPRESENTATION
### (On Behalf of the Nationwide Class)

141.    Plaintiff re-allege and incorporates by reference all preceding allegations as if fully set forth herein.

142.    Nevada has adopted the Restatement (Second) of Torts § 551 (1977), which imposes liability for negligent misrepresentations based on omissions. Section 551, titled "Liability for Nondisclosure," states:

One who fails to disclose to another a fact that he knows may justifiably induce the

---

[57] Robert McMillan & Deepa Seetharaman, *Facebook Finds Hack Was Done By Spammers, Not Foreign State.* The Wall Street Journal (Oct. 17, 2018), available at: https://www.wsj.com/articles/facebook-tentatively-concludes-recent-hack-was-perpetrated-by-spammers-1539821869 (last visited Sept. 27, 2023).

other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if . . . he is under a duty to the other to exercise reasonable care to disclose the matter in question.

143.    MGM failed to disclose to Plaintiff and Class Members that it did not employ reasonable safeguards to protect consumers' PII.

144.    MGM's omissions were made for the guidance of consumers in their transactions with MGM.

145.    MGM failed to disclose facts that MGM knew may justifiably induce consumers to act or refrain from acting in their business transactions with MGM.

146.    MGM's omissions were made in the course of MGM's business.

147.    MGM had a duty to speak regarding the inadequacy of its data security practices and its inability to reasonably protect consumers' PII.

148.    MGM knew or should have known that its data security practices were deficient.

149.    This is true because, among other things, MGM was aware that the hotel industry was a frequent target of sophisticated cyberattacks. MGM knew or should have known that its data security practices were insufficient to guard against those attacks.

150.    MGM was in a special relationship with, or relationship of trust and confidence relative to, consumers. MGM was in an exclusive position to ensure that its safeguards were sufficient to protect against the foreseeable risk that a data breach could occur. MGM was also in exclusive possession of the knowledge that its data security processes and procedures were inadequate to safeguard consumers' PII.

151.    MGM's omissions were material given the sensitivity of the PII maintained by MGM and the gravity of the harm that could result from theft of the PII.

152.    Data security was an important part of the substance of the transactions between MGM and consumers.

153.    MGM knew that consumers would enter into business transactions under a mistake as to facts basic to the transactions. Because of the relationship between the parties, consumers

would reasonably expect a disclosure of the basic facts regarding MGM's inadequate data security.

154.    Had MGM disclosed to Plaintiff and Class Members that its systems were not secure and thus were vulnerable to attack, Plaintiff and Class Members would not have entrusted their PII to MGM.

155.    MGM should have made a proper disclosure to consumers when accepting hotel reservations, during the check-in process, or by any other means reasonably calculated to inform consumers of its inadequate data security.

156.    In addition to its omissions, MGM is also liable for its implied misrepresentations. MGM required consumers to provide their PII during the reservation and/or check-in process. In doing so, MGM made implied or implicit representations that it employed reasonable data security practices to protect consumers' PII. By virtue of accepting Plaintiff's PII during the reservation and check-in process, MGM implicitly represented that its data security processes were sufficient to reasonably safeguard the PII. This constituted a negligent misrepresentation.

157.    MGM failed to exercise reasonable care or competence in communicating its omissions and misrepresentations.

158.    As a direct and proximate result of MGM's omissions and misrepresentations, Plaintiff and Class Members suffered the various types of damages alleged herein.

159.    Plaintiff and Class Members are entitled to all forms of monetary compensation and injunctive relief set forth herein.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of the Nationwide Class)**

160.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

161.    When Plaintiff and Class Members provided consideration and PII to MGM in exchange for MGM's services, they entered into implied contracts with MGM under which MGM agreed to adopt reasonable steps to protect their PII.

162.    MGM solicited and invited Plaintiff and Class Members to purchase its services.

As part of that process, Plaintiff and Class Members were required to provide their PII.

163. When entering into the implied contracts, Plaintiff and Class Members reasonably believed and expected that MGM would implement reasonable data security measures and that MGM's data security practices complied with relevant laws, regulations, and industry standards. MGM knew or reasonably should have known that Plaintiff and Class Members held this belief and expectation.

164. When entering into the implied contracts, MGM impliedly promised to adopt reasonable data security measures. MGM required consumers to provide their PII during the reservation and/or check-in process. In doing so, MGM made implied or implicit promises that its data security practices were reasonably sufficient to protect consumers' PII. By virtue of accepting Plaintiff's PII during the reservation and check-in process, MGM implicitly represented that its data security processes were reasonably sufficient to safeguard the PII.

165. MGM's conduct in requiring consumers to provide PII as a prerequisite to the use of MGM's services illustrates MGM's intent to be bound by an implied promise to adopt reasonable data security measures.

166. Plaintiff and Class Members would not have provided their PII to MGM in the absence of MGM's implied promise to keep the PII reasonably secure.

167. Plaintiff and Class Members fully performed their obligations under the implied contracts with MGM. They provided consideration and their PII to MGM in exchange for MGM's services and its implied promise to adopt reasonable data security safeguards.

168. MGM breached its implied contracts with Plaintiff and Class Members by failing to implement reasonable data security measures.

169. As a result of MGM's conduct, Plaintiff and Class Members have suffered, and continue to suffer, legally cognizable damages arising from the Data Breach as set forth above.

170. Plaintiff and Class Members are entitled to all forms of monetary compensation and injunctive relief set forth herein.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of the Nationwide Class)**

171.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

172.    This claim is plead in the alternative to the breach of implied contract claim.

173.    Plaintiff and Class Members conferred monetary benefits on MGM.

174.    In exchange, Plaintiff and Class Members should have received MGM's services as well as adequate safeguarding of their PII.

175.    MGM profited from its transactions with Class Members in two ways.  First, MGM received monetary consideration as revenue. Second, MGM used Class Members' PII for a variety of profit-generating purposes beyond simply providing its services. MGM used the PII for marketing and other purposes discussed more fully above. MGM used the PII to generate future stays from consumers and derive future revenues and profit.

176.    The money Plaintiff and Class Members paid to MGM was intended to be used by MGM, in part, to fund MGM's costs of providing reasonable data security.

177.    MGM failed to provide reasonable data security, yet it kept all monies paid by Plaintiff and Class Members.

178.    GM knew that Plaintiff and Class Members conferred monetary and other benefits on MGM. MGM accepted those benefits.

179.    Under principles of equity and good conscience, MGM should not be permitted to retain the full monetary benefit of its transactions with Plaintiff and Class Members.  MGM failed to adequately secure consumers' PII and, therefore, did not provide the full services that consumers paid for.

180.    MGM acquired consumers' money and PII through inequitable means in that it failed to disclose its inadequate data security practices when entering into transactions with consumers and obtaining their PII.

181.    If Plaintiff and Class Members would have known that MGM employed inadequate

data security safeguards, they would not have agreed to transact with MGM or would have transacted only at reduced prices.

182.    Class Members have no adequate remedy at law. MGM continues to retain Class Members' PII while exposing the PII to a risk of future data breaches while in MGM's possession. MGM also continues to derive a financial benefit from using Class Members' PII.

183.    As a direct and proximate result of MGM's conduct, Plaintiff and Class Members have suffered the various types of damages alleged herein.

184.    MGM should be compelled to disgorge into a common fund or constructive trust, for the benefit of Class Members, the proceeds that they unjustly received from Class Members. In the alternative, MGM should be compelled to refund the amounts that Class Members overpaid for MGM's services.

**COUNT V**
**VIOLATION OF THE NEVADA CONSUMER FRAUD ACT**
**Nev. Rev. Stat. § 41.600**
**(On Behalf of the Nationwide Class)**

185.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

186.    The Nevada Consumer Fraud Act, Nev. Rev. Stat. § 41.600, states:

> 1. An action may be brought by any person who is a victim of consumer fraud.

> 2. As used in this section, "consumer fraud" means: . . . (e) A deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive.

187.    In turn, Nev. Rev. Stat. § 598.0923(2) (a section of the Nevada Deceptive Trade Practices Act) states: "A person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she knowingly: . . . 2) Fails to disclose a material fact in connection with the sale or lease of goods or services." MGM violated this provision because it failed to disclose the material fact that its data security practices were deficient and that its cloud server security settings were not adequate to protect consumers' PII. MGM knew or should have

known that its data security practices were deficient. This is true because, among other things, MGM was aware that the hotel industry was a frequent target of sophisticated cyberattacks. MGM knew or should have known that its cloud server data security practices were insufficient to guard against those attacks. MGM had knowledge of the facts that constituted the omission. MGM could and should have made a proper disclosure when accepting hotel reservations, during the check-in process, in the registration for its MGM Rewards loyalty program, in its Privacy Policy, or by any other means reasonably calculated to inform consumers of its inadequate data security.

188.    Also, Nev. Rev. Stat. § 598.0923(3) states: "A person engages in a 'deceptive trade practice' when in the course of his or her business or occupation he or she knowingly: . . .  3) Violates a state or federal statute or regulation relating to the sale or lease of . . . services." MGM violated this provision for several reasons, each of which is an independent predicate act for purposes of violating § 598.0923(3).

189.    *First*, MGM breached a Nevada statue requiring reasonable data security. Specifically, Nev. Rev. Stat. § 603A.210(1) states: "A data collector that maintains records which contain personal information of a resident of this State shall implement and maintain *reasonable security measures* to protect those records from unauthorized access, acquisition, . . . use, modification or disclosure." (Emphasis added.) MGM is a data collector as defined under the statute at Nev. Rev. Stat. § 603A.030. MGM failed to implement and maintain reasonable security measures, evidenced by the fact that hackers accessed its cloud server and stole consumers' PII. MGM's violation of this statute was done knowingly for purposes of Nev. Rev. Stat. § 598.0923(3). MGM knew or should have known that its data security practices were deficient. This is true because, among other things, MGM was aware that the hotel industry was a frequent target of sophisticated cyberattacks. MGM knew or should have known that its cloud server data security practices were insufficient to guard against those attacks. MGM had knowledge of the facts that constituted the violation.

190.    *Second*, MGM breached other state statues as alleged herein. MGM also violated Nev. Rev. Stat. § 598.0923(2) as alleged in this Count. MGM knew or should have known that it

1  violated these statutes. MGM's violation of each of these statutes serves as a separate predicate act
2  for purposes of violating Nev. Rev. Stat. § 598.0923(3).

3          191.    *Third*, MGM violated the FTC Act, 15 U.S.C. § 45, as alleged above. MGM knew
4  or should have known that its data security practices were deficient, violated the FTC Act, and that
5  it failed to adhere to the FTC's data security guidance for businesses. This is true because, among
6  other things, MGM was aware that the hotel industry was a frequent target of sophisticated
7  cyberattacks. MGM knew or should have known that its cloud server data security practices were
8  insufficient to guard against those attacks.  MGM had knowledge of the facts that constituted the
9  violation. MGM's violation of the FTC Act serves as a predicate act for violating Nev. Rev. Stat.
10  § 598.0923(3).

11          192.    MGM engaged in deceptive or unfair practices by engaging in conduct that is
12  contrary to public policy, unscrupulous, and caused injury to Class Members.

13          193.    Plaintiff and Class Members were denied a benefit conferred on them by the Nevada
14  legislature.

15          194.    Nev. Rev. Stat. § 41.600(3) states that if the plaintiff prevails, the court "shall
16  award: (a) Any damages that the claimant has sustained; (b) Any equitable relief that the court
17  deems appropriate; and (c) the claimant's costs in the action and reasonable attorney's fees."

18          195.    As a direct and proximate result of the foregoing, Plaintiff and Class Members
19  suffered all forms of damages alleged herein. Plaintiff's harms constitute compensable damages
20  under Nev. Rev. Stat. § 41.600(3).

21          196.    Plaintiff and Class Members are also entitled to all forms of injunctive relief sought
22  herein.

23          197.    Plaintiff and Class Members are also entitled to an award of their attorney's fees
24  and costs.

25

26

27

28

**COUNT VI**
**VIRGINIA DATA BREACH NOTIFICATION LAW**
**V.A. CODE ANN. § 18.2-186.6(b), *et seq.***
**(On Behalf of the Virginia Subclass)**

198.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

199.    MGM is required to accurately notify Plaintiff and Class Members following discovery or notification of a breach of their data security system (if unencrypted or unredacted personal information was or is reasonably believed to have been accessed and acquired by an unauthorized person who will, or it is reasonably believed who will, engage in identify theft or another fraud) without unreasonable delay under Va. Code Ann. § 18.2-186.6(B).

200.    MGM is an entity that own or license computerized data that includes personal information as defined by Va. Code Ann. § 18.2-186.6(B).

201.    Plaintiff and Class Members' Personal Information (e.g., Social Security numbers) includes personal information as covered under Va. Code Ann. § 18.2-186.6(A).

202.    Because MGM discovered a breach of their security system (in which unencrypted or unredacted personal information was or is reasonably believed to have been accessed and acquired by an unauthorized person, who will, or it is reasonably believed who will, engage in identify theft or another fraud), MGM had an obligation to disclose the Data Breach in a timely and accurate fashion as mandated by Va. Code Ann. § 18.2-186.6(B).

203.    As a direct and proximate result of MGM's violations of Va. Code Ann. § 18.2-186.6(B), Plaintiff and Class Members suffered damages, as described above.

204.    Plaintiff and Class Members seek relief under Va. Code Ann. § 18.2-186(K), including but not limited to, actual damages.

**COUNT VII**
**MARYLAND CONSUMER PROTECTION ACT**
**MD CODE COMMERCIAL LAW, § 13-301, *et seq.***
**(On Behalf of the Maryland Subclass)**

205.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully

set forth herein.

206. Plaintiff brings this claim MGM operating in the state of Maryland on behalf of the Maryland Subclass.

207. Maryland Class Members are "consumers" as meant by Md. Code Ann., Com. Law § 13-101.

208. MGM provides services that are "consumer goods" and/or "consumer services" as meant by Md. Code Ann., Com. Law § 13-101.

209. The unlawful trade practices, misrepresentations, and omissions described herein did not constitute "professional services" on the part of Defendant.

210. Defendant, operating in Maryland, engaged in unlawful trade practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of its services in violation of Md. Code Ann., Com. Law § 13-301, including but not limited to the following: a) Defendant misrepresented material facts, pertaining to the sale of its services, to the Maryland Class by representing that it would maintain adequate data privacy and security practices and procedures to safeguard Maryland Class Members' PII from unauthorized disclosure, release, data breaches, and theft in violation of Md. Code Ann., Com. Law § 13-301(1), (2)(i), (2)(iv), (3), (5)(i), (9)(i), (9)(iii), and 14(xxi);

b) Defendant misrepresented material facts, pertaining to the sale of its services, to the Maryland Class by representing that it did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Maryland Class Members' PII in violation of Md. Code Ann., Com. Law § 13-301(1), (2)(i), (2)(iv), (3), (5)(i), (9)(i), (9)(iii), and 14(xxi);

c) Defendant omitted, suppressed, and concealed the material fact of the inadequacy of the privacy and security protections for the Maryland Class Members' PII in violation of Md. Code Ann., Com. Law § 13-301(1), (2)(i), (2)(iv), (3), (5)(i), (9)(i), (9)(iii), and 14(xxi);

d) Defendant engaged in unfair acts and practices with respect to the sale of its services by failing to maintain the privacy and security of Maryland Class Members' PII, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the Data Breach. These unfair acts and practices violated duties imposed by laws including the Federal Trade Commission Act (15 U.S.C. § 45); Maryland's Privacy of Consumer Financial and Health Information regulations (Md. Code Regs. 31.16.08.01, *et seq.*); Maryland's data breach statute (Md. Code Ann. Com. Law § 14-3503), and Maryland's Social Security Number Privacy Act (Md. Code Ann., Com. Law § 14-3401, *et seq.*);

e) Defendant engaged in unfair acts and practices with respect to the sale of its services by failing to disclose the Data Breach to Maryland Class Members in a timely and accurate manner, in violation of Md. Code Com. Law § 14-3504(b)(3);

f) Defendant engaged in unfair acts and practices with respect to the sale of its services by failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Maryland Class Members' PII from further unauthorized disclosure, release, data breaches, and theft.

211.    The above unfair and deceptive practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

212.    Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard Maryland Class Members' PII and that risk of a data breach or theft was highly likely. Defendant's actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the Maryland Class.

213.    As a direct and proximate result of Defendant's unlawful practices, Maryland Class Members suffered injury and/or damages.

214.    Maryland Class Members seek relief under Md. Code Ann., Com. Law § 13-408, including, but not limited to, damages, injunctive relief, and attorneys' fees and costs.

## VIII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated individuals, respectfully request the following relief:

(a) An Order certifying this case as a class action;

(b) An Order appointing Plaintiff as a class representative;

(c) An Order appointing the undersigned counsel as class counsel;

(d) Injunctive relief requiring MGM to: (i) strengthen its data security systems and procedures; (ii) submit to future annual audits of those systems; and (iv) delete PII that MGM no longer needs for processing services previously provided to

1    Class Members;

2    (e) An award of compensatory damages, money for significant and reasonable

3    credit monitoring, statutory damages, treble damages, and punitive damages;

4    (f) An award of Plaintiff's attorneys' fees and litigation costs; and

5    (g) Such other and further relief as this Court may deem just and proper.

6  **IX.    DEMAND FOR JURY TRIAL**

7    Plaintiff demands a trial by jury as to all issues so triable.

8    DATED this 28th day of September, 2023.

9    Respectfully submitted,

10    KEMP JONES, LLP

11    _/s/ Don Springmeyer_

12    Don Springmeyer, Esq. (NBN 1021)
       3800 Howard Hughes Parkway, 17th Floor

13    Las Vegas, NV 89169

14    James J. Pizzirusso (*Pro Hac Vice forthcoming*)
       Amanda V. Boltax (*Pro Hac Vice forthcoming*)

15    HAUSFELD LLP

16    888 16th Street, NW, Suite 300
       Washington, D.C. 20006

17

18    Steve N. Nathan (*Pro Hac Vice forthcoming*)
       HAUSFELD LLP

19    33 Whitehall Street, 14th Floor
       New York, NY 10004

20

21    Douglas J. McNamara (*Pro Hac Vice forthcoming*)
       Brian E. Johnson (*Pro Hac Vice forthcoming*)

22    COHEN MILSTEIN SELLERS & TOLL, PLLC
       1100 New York Ave, 5th Floor

23    Washington, DC 20005

24    Amy Keller (*Pro Hac Vice forthcoming*)
       James Ulwick (*Pro Hac Vice forthcoming*)

25    DiCELLO LEVITT LLP

26    Ten North Dearborn Street, Sixth Floor
       Chicago, IL 60602

27    *Counsel for Plaintiff and the Class*

28